## PIONEER OYSTER CO. v. PUGET SOUND PULP & TIMBER CO.

### No. 8.

District Court, W. D. Washington, N. D.

Nov. 17, 1941.

Lundin & Barto, Alfred H. Lundin, McMicken, Rupp & Schweppe, Alfred J. Schweppe, and J. Gordon Gose, all of Seattle, Wash., for plaintiff.

Evans, McLaren & Lane, Robert H. Evans, and W. G. McLaren, all of Seattle, Wash., and Sather & Livesey, and Charles A. Sather, all of Bellingham, Wash., for defendant.

BOWEN, District Judge.

This is an action commenced January 17, 1940, by plaintiff corporation for the benefit of itself and other associates who assigned their claims to it (plaintiff and its assignors all being hereinafter referred to as plaintiff) against the defendant pulp manufacturing company to recover damages alleged to have been caused by defendant's waste sulphite pulp liquor and waste pulp fiber to plaintiff's oysters (known as Japanese or Pacific oysters) on their beds in Padilla Bay near Anacortes, Skagit County, Washington, and for injunctive relief against similar future acts and damages.

The case being one of equitable cognizance was tried by the court without a jury. The trial consumed about 30 days, and the transcript of the trial proceedings covers about 4,335 pages. In company with counsel on both sides, the trial judge during two days viewed the oysters on the beds, the defendant's Bellingham pulp mill, and other things and conditions in and about Bellingham and Padilla bays and Anacortes Harbor deemed by counsel material to the trial.

The issues are simple. Plaintiff claims that the discharge by defendant from its two pulp mills (one at Bellingham and one at Anacortes) of waste sulphite pulp liquor and waste pulp fiber into the tidewaters of Bellingham Bay and Anacortes Harbor has caused and continues to cause a poisonous pollution of those waters, and that this pollution has found and in increasing

amounts continues to find its way into the waters of Padilla Bay over plaintiff's oyster beds, injuring plaintiff's oysters and killing many of them, with the result that, although the oysters were in good marketable condition prior to 1938, during that year and subsequently they have become worthless except for a small transplantation value, all to plaintiff's damage in the total sum of $1,780,000.

Defendant, although admitting discharge of its waste sulphite pulp liquor into tidewater adjacent to its pulp mills, denies that plaintiff's oysters have been or will be damaged thereby, and affirmatively alleges that (1) plaintiff's action is barred by the statute of limitations; (2) that plaintiff's action is also barred by laches because at no time before it was commenced did plaintiff or its predecessors in interest make any complaints or any claim of damage to the oysters from defendant's pulp mill operations, and during the period since plaintiff began the planting and cultivating of the oysters defendant has spent and become obligated to spend large sums of money in carrying on defendant's operations and expanding its facilities, and plaintiff should have notified defendant of any claimed damage to oysters; (3) that plaintiff has no capacity to sue for the assignors; (4) that plaintiff is not the real party in interest; and (5) that the oysters were improperly planted, cared for, cultivated and prepared for sale, and plaintiff and its associates were unable to find or provide a market for the oysters.

The defendant's pulp mills at Anacortes and Bellingham commenced regular production of pulp in 1926. The Bellingham mill shows generally an annual increase in production from 1,230 tons of pulp in 1926, to a high of 100,839 tons in 1940. The Anacortes mill production has been much smaller, but it increased annually from 8,355 tons in 1926 to 16,167 tons in 1930, dropped back to 8,725 tons in 1931, produced nothing in 1932, produced 8,998 tons in 1933, and ranged from 20,487 to 27,297 tons among the years 1934–1940, except for the years 1938 and 1939. The Bellingham mill's production jumped from 47,682 in 1938 to 87,577 tons in 1939, but the Anacortes mill produced nothing in 1938 and only 6,839 tons in 1939.

Defendant's mills produce unbleached sulphite pulp and that pulp manufacturing process comprises, among other things, the 7 to 12 hours cooking of chipped pulp wood (principally hemlock) in digestors containing a solution of 2,000 gallons of cooking liquor and 30,000 gallons of fresh water per ton of pulp produced. The cooking liquor contains approximately 260 lbs. of sulphur and 342 lbs. of lime rock (per ton of pulp produced) dissolved in about 2,000 gallons of fresh water (per ton of pulp produced). After the cooking process is completed the digestor liquor containing the cooked wood fiber and cooking liquor is put through washing and screening processes in which more fresh water is used and then the pulp goes to the pulp machines where it is formed into sheets and dried. The water used in the various processing operations, containing the cooking liquor, is finally discharged into the sewer and into tidewater adjacent to the mill. Also some wood fiber wasted through plant shut downs is deposited on the bottom in tidewater near the mouth of the sewer.

The Anacortes mill is 3 nautical miles from the south end Padilla oyster beds and 4½ miles from the north end beds or Lundin Tract. The Bellingham mill is 12 miles from the north end beds or Lundin Tract and 16 miles from the south end beds.

In 1930, R. H. Bailey and Alfred H. Lundin each had 50 boxes of Japanese oyster seed planted on their respective tide lands in the south and north ends of Padilla Bay. The results in the growth and quality of oysters produced from these initial plantings were successful, and in October, 1931, Mr. Bailey, Mr. Lundin and Mr. H. J. Waters organized the Padilla Point Oyster Company, a corporation, to further the commercial production of Japanese oysters in Padilla Bay. Mr. Bailey acquired from his brother a 943-acre tract of tide land in the south end of that Bay which he subdivided and sold in one-acre tracts to numerous persons who in turn leased their lands to and entered into oyster seed purchasing and pooling agreements with the Oyster Company for the planting, care, cultivating and marketing of oysters for the pro rata benefit of all concerned. Mr. Lundin acquired an 800-acre tract in the north end of the Bay, the planted portions of which were pooled in the same way, and some other growers have come into the pooling agreements.

The oysters involved in this action are those produced from seed planted as follows: 18,820 boxes in 1933; 47,716 boxes in 1934; 8,546 boxes in 1935 and 600 boxes planted in 1936; total boxes of seed planted

in those years, 75,682. Some of these were planted on the Lundin beds in the north end of the Bay and some on the beds of the south end. The production and marketing of oysters from these plantings, either as fresh or canned oysters, or canned .oyster soup, progressed successfully until the fall of 1936 when marketing was halted by a longshoremen's strike which lasted until February, 1937. Then followed the nation's economic recession of that year, with the result that marketing operations for this oyster business was at a standstill for approximately a year from the fall of 1936 to near the end of 1937. Through the winter months of 1937–38, the fall of 1938 and winter of 1938–39, oyster sales from the Padilla Bay beds were confined to the fresh oyster market demand of one wholesaler. This fresh oyster market, however, was lost to Padilla oysters in 1939, because of the poor condition of the oysters and the decrease in oyster meats yield, when it was said to take too many oysters in the shell to shuck out a gallon of fresh oyster meats. The result was financial disaster to the Company and loss of its business.

In the spring of 1938, the Padilla Point Oyster Company was dissolved in the state court, some of its creditors were paid, others were given an interest in oysters and security in oyster lands, and the plaintiff corporation, a new company, was formed to and did take over the remaining assets and obligations of the dissolved corporation, including the latter's cause of action and its associates' causes of action herein sued upon and the obligation to cultivate, care for, and market the oysters under the leasing and seed pooling agreements. Since 1939, plaintiff has done very little if any selling of oysters, except about 100,000 gallons (including some sold in 1938) sold for transplanting to Similk Bay on the southwesterly side of Fidalgo Island in Skagit County, Washington, and to the B. C. Packers oyster beds in Boundary Bay, British Columbia.

Mr. Bailey, the chief executive and guiding spirit of plaintiff's enterprise, testified among other things that after careful study and planning the oysters were planted and cared for in approved manner, that they grew and developed normally and yielded good merchantable products as fresh or canned oysters or soup until 1938, but that during that year the oysters became brown in color with green and yellow tinges and lost their flavor, and that thereafter plaintiff's Padilla oysters could not compete with other oysters on the market and became absolutely unmarketable. Mr. Waters, another of the most active officials in plaintiff's oyster business, supported Mr. Bailey's testimony and supplied many helpful details.

Much of the testimony concerns the methods and the results thereof for determining whether pulp liquor and pulp fiber are present in the water over plaintiff's oyster beds in sufficient quantities to injure the oysters.

The parties do not agree that there is any generally accepted chemical test by which the presence of sulphite pulp liquor in sea water can be certainly determined. Plaintiff frankly says that there is no such chemical test which is reliable and its position is supported by its expert testimony. Defendant however contends that chemical tests for that purpose are reliable and in connection with this case made extensive use of one chemical test known as the Pearl-Benson colorization test by which color reflecting reagents are used to reflect the amber color of sulphite pulp liquor when it is present. And plaintiff had some Pearl-Benson tests made, as its counsel say, for whatever they were worth.

Plaintiff's witness Kneisley, a commercial chemist, testified to conducting Pearl-Benson tests on water samples taken from over plaintiff's oyster beds (Tr. 2168, 2174), using sodium nitrate, acetic acid and ammonia as color reagents, and finding approximately 10 parts of liquor per million parts of water, but said it is difficult to identify waste sulphite pulp liquor when the dilution of it is as low as 25 or 35 parts of liquor per million parts of water because the substances used to identify the liquor are also present in sea water in considerable quantity.

Defendant's witness Dr. Kobe, associate professor of chemical engineering, University of Washington, testified that the Pearl-Benson test is the best known test for determining the presence of sulphite pulp liquor, that it is usable and accurate (for detection of harmful amounts of liquor, "harmful" in sense used by plaintiff, amounts not below 10 parts liquor per million of water), that he used it on test water taken over a number of days from various stations in Padilla Bay surrounding plain-

tiff's oyster beds, and that he found no pulp liquor in the water over the adjacent Nauman and Grant beds or in the other tested waters nearest plaintiff's oyster beds. Dr. Kobe also made numerous tests on water samples taken on different tides from stations in 3 different tidal cycles or gateways (all there were) between defendant's pulp mills and Padilla Bay over a period of about three months, and these tests showed small amounts of liquor at some of the stations nearest the pulp mills, but showed negative at the stations in these gateways nearest the plaintiff's oyster beds. He said the reason these gateways were used instead of locations over plaintiff's oyster beds for test water sampling was that if pulp liquor was reaching the oyster beds it would certainly show up in these gateways, and that in his opinion no pulp liquor reached Padilla Bay from defendant's pulp mills.

Defendant's witness Dr. Haffner, a chemist of wide experience in pulp pollution problems, made chemical tests of a great number of water samples taken at 3 different stations over plaintiff's oyster beds from time to time during the months of March, April, May, June, July and August, of 1940 and January, February, March, April and May, 1941, and Dr. Haffner was unable at any time during any of those months to find any pulp liquor in the water over plaintiff's oyster beds, although he found a high consumption of oxygen in the water which he attributed to presence of waste materials brought in by surface drainage from the surrounding rural country side.

Both Dr. McMillan and Mr. Kneisley for the plaintiff testified that by microscopic examinations they found wood or pulp fibers in Padilla Bay water but they also said that, although the fibers were of a kind which could have come from a sulphite pulp source, they could not by their examinations tell where these fibers came from. But by a number of chemical tests made by Dr. Pearl of the University of Washington Chemistry Department it was definitely shown that, although the water samples taken near the Anacortes mill showed sulphite pulp fibers, the samples taken some distance away from the mill and near the oyster beds contained either no fibers except a very small trace such as commonly found in any water, or only wood fibers which might come from any wood source and were not traceable to sulphite pulp, or as in one instance fibers which might or might not be traceable to a sulphite pulp source because the fibers were of the type used in the manufacture of so many different products.

Certain biological tests were under controlled conditions conducted by plaintiff's expert witnesses for the purpose of showing the toxic effects of sulphite pulp liquor upon Japanese oysters and the presence of harmful amounts of such liquor in the water over the Padilla oyster beds.

One of such tests, by or under the direction of Dr. Harvey C. McMillan, who is professor of Biology at Seattle Pacific College and an experienced biologist and student of oyster life, was made by the kymograph method by which a lever was at one end attached to the shell of a live oyster immersed in controlled solutions of such liquor, with the other end of the lever in contact with a revolving roll of smoked paper. As the oyster shell opened and closed while the oyster was feeding, the shell movement was recorded on the paper, and to the skilled observer that record reflected the toxic effect of the liquor upon the oyster. This experiment was conducted on different oysters in varying solutions of pulp liquor and also in undiluted water from different localities. In some instances of pulp liquor solutions the feeding process was slowed and in others it was discontinued and the oyster died from the effects of the liquor. It was testified by Dr. McMillan that by the kymograph test sulphite pulp liquor solutions as low as 10 parts of liquor per million parts of water were by the biologic reaction of the oysters shown to be toxic and harmful to Japanese oysters when exposed over long periods of time; and that this test on oysters immersed in Padilla Bay water showed unfavorable reaction by the oysters. The kymograph test does not purport to show chemical constituents of the liquid used in the test.

And in the broken shell test, Dr. McMillan testified that when he cut and broke away parts of the shells of live oysters and then immersed them in Padilla Bay water, the oysters showed an unfavorable reaction, but there is no way of telling what influence the broken shells and the consequent unnatural exposure uncontrollable by the oysters themselves may have had upon them, and that test like the kymograph test did not of itself show whether it was pulp liquor or some other ingredient in the test water which unfavorably affected the oysters. The specific cause of that unfavorable reaction was in the broken shell test again left

to the uncertain realm of possible inferences rather than shown to be the proven work of identified toxic agencies traceable to defendant's pulp mill effluents.

Defendant's witness Dr. Trevor Kincaid, head of the Department of Biology at the University of Washington since 1901, an outstanding expert in the study of oyster life and culture since about 1912, and a grower of Japanese oysters, testified that oysters injured by sulphite pulp liquor always show signs of such injury in their gill or ciliary structures, but that among the great number of plaintiff's oysters taken from the beds from time to time over a long period of time, he did not find a single one which showed any such sign of such injury. It might reasonably be asked whether that kind of physical injury or its effects, if it did exist, would be likely to disappear as a result of transplantation in more favorable waters. That question is not expressly answered by the statement of any witness nor is it expressly answered by this case's record of the history of the approximately 100,000 gallons of plaintiff's oysters transplanted to Similk and Boundary bays, but it must be noted that the evidence in connection with transplanting or otherwise discloses no objection from any quarter to plaintiff's oysters because of previous physical or pathological injury by pulp liquor. Dr. Kincaid said he "was unable to find at any time on any of the samples any sign of pathological change in the oysters. They all were perfectly normal insofar as their structure and their physiological activities were concerned." (Tr. 3703). There is no evidence of actual physical injury to the oysters by pulp liquor.

Plaintiff contends, however, that aside from actual physical injury the oysters will not take sufficient food from water containing only a relatively small amount of pulp liquor which results in retarded growth and poor condition of the oysters, and therefrom plaintiff, noting the bad condition before and the improved condition after transplanting, argues that the improvement in the growth and condition of Padilla oysters when transplanted to Similk Bay and to the B. C. Packers Boundary Bay beds proves the presence in Padilla Bay of pulp liquor in solutions sufficiently strong to adversely affect the oysters. But this contention of plaintiff is greatly weakened if not negatived by positive proof that similar improvement in the growth and condition of Padilla oysters resulted from transplanting some of them from the Lundin beds on the north end of the Bay to other locations in Padilla Bay westerly from the present Lundin beds, on new beds nearer to. Hat and Saddleback islands and the Guemes Channel currents north of those islands.

Professor Charles W. Harris, head of the Department of Hydraulics, University of Washington, and a teacher in tidal current subjects since 1907, made a study of currents affecting the waters of Bellingham, Samish and Padilla bays. He testified in effect that by reason of the action of these tidal currents none of the liquor from the Bellingham and Anacortes mills ordinarily reaches Padilla Bay. This conclusion was supported by witness Huntoon, an engineer and fish trap locator, and by witnesses Kaylor, Frank Gilkey and William Gilkey, tug boat men, and by Dr. Benson, head of the Chemistry Department, University of Washington. Professor Harris studied these currents during a period of about three months beginning in February 1940, after a preliminary study in September 1939. His testimony and that of others is to the effect that, by tidal currents feeding into and out of Skagit Bay through Swinomish Slough and into and out of the Straits of Georgia through Rosario Straits, Guemes Channel, Bellingham Channel and Hale Passage, the waters in and about Bellingham and Padilla bays are moved in and out in such manner that the waste pulp liquor of defendant's Bellingham and Anacortes mills runs out away from Padilla Bay on the ebb tide, and that on the incoming tide fresh sea water from Rosario Straits and Skagit Bay is brought into Padilla Bay.

Naturally throughout the trial the dominant question presented by the issues was, What is wrong with plaintiff's oysters? Bearing upon that question, and in addition to the scientific testimony produced by both sides, there was introduced by defendant the testimony of some 18 experienced growers (including Dr. Kincaid who also testified as a scientific expert) of Japanese oysters on Samish Bay, Henderson Bay (near Tacoma), Willapa Harbor and Grays Harbor. These witnesses inspected plaintiff's beds and oysters and, with some exceptions, found the oysters on plaintiff's south end beds generally in good condition, but said that as to the north end beds, although the oysters on the outside or periphery of the beds and those which had become scattered were in good condition, the oysters in the center of the beds were

too thick and were in very bad condition. This condition and the effects of it upon the oysters were described by these practical oystermen variously as too thickly planted oysters, heavily overplanted, not cultivated, "not moved or done anything with for six years", oysters in very bad condition, bad color, not fat, too lean, thin, poor, "about as lean as they could get and live", "piled up in very poor condition", "planted very very thickly", "planted too thick and they have not been cultivated", "surprised at the thickness that they were planted. I didn't see how they could live as thick as they were", "they would not get fat when they were planted as thick as they were", the oysters are thin "because there are too many oysters", "all thin oysters I ever had any experience with were pretty much all the same color" (commenting upon the color similarity between the poor oysters on the north end beds and other thin oysters the witness had seen).

Among these oystermen witnesses was former State Senator E. N. Steele, of the Rock Point Oyster Co. on Samish Bay, who has grown Japanese oysters since about the beginning of the industry, has for several years been president of Pacific Oyster Growers Association, and is manager for the Olympia oyster business of Rayonier Pulp & Paper Co. at Oakland Bay and Chapman's Cove in the Shelton area. He testified that (Tr. 2727):

"As you get out into the tract (the Lundin or north end tract) even 50 feet you will notice the difference in the oysters that are on top. The oysters are as much as 3 deep and if you go down to the one on the bottom it is nothing but skin and brown —or the greenish tinge and just absolutely in a very bad condition." And (Tr. 2730) "It is only when you get inside of the outer rim that they are not so fat and those underneath, as I explained, are very poor; but outside of that there is nothing wrong with them."

Dr. Kincaid, who operates in Willapa Harbor his own 53-acre oyster farm, testified that in the earlier experimental stages of the industry the oysters were planted too thick resulting in serious trouble in undernourished and undeveloped oysters through lack of the food supply, and that that condition and result are paralleled by present conditions in Padilla Bay (Tr. pp. 3682–86). As to waters like those of Padilla Bay, he said there was no such thing as an unlimited oyster food supply. He "found an enormous range in the appearance of the (plaintiff's) oysters themselves; that is, in the size of the oyster and in their condition. And that often came about in a very short distance; just a few yards." (Tr. 3703–04). He also said that "There were differences due to crowding; the fact that some of them were densely massed; some of them are widely separated, and some of them are in masses and clusters. * * *" (Tr. 3704), and in effect that these (among other) differences in environmental conditions affect the food supply of the oysters (Tr. 3705). Also among the badly crowded oysters Dr. Kincaid found elongated oddly shaped ones, of which he said (Tr. 3713–15):

"So, you get a very large number of that sort, a very impoverished-looking oyster; that is, all in that particular area. And only a short distance away, separated by a very short distance, you have oysters of this type (indicating a normally shaped one, in Exh. A-240). * * * These differences are due to the processes of natural conditions; ecological differences of different sections of the bay, due to differences in current and food supply, differences in elevation, differences in the way the currents flow over the beds, and partly due to human agency; that is, to crowding, to poor cultivation, failure to break up the clusters to give the oysters a chance to grow, and the massing of them in too great masses in restricted areas."

He further stated that oysters in an emaciated or impoverished condition ordinarily have a greenish or brownish shade due not to anything wrong with the oysters except their impoverished condition (Tr. 3725). His testimony is in agreement with other witnesses to the effect also that where the Padilla oysters are not in a crowded or massed condition and are scattered and cultivated properly under conditions enabling them to obtain a proper amount of food, the oysters are generally normal and healthy.

Some of plaintiff's witnesses testified that the shells of dead oysters at times appeared on the beds in large numbers indicating excessive mortality, but Mr. Amos, manager for Rock Point Oyster Co., and others of defendant's witnesses, including Dr. Kincaid who gave special attention to this subject, said they saw no evidence of abnormal mortality among plaintiff's oysters.

It is a most notable circumstance that other forms of sea life in Padilla Bay, such as blue mussels, limpets, scallops, six-ray starfish, jellyfish, sea slugs and crabs, native to the Bay's waters, are now in normal condition and show no signs of injury from pulp liquor or otherwise. Dr. Kincaid testified that in May, 1940, and April and July, 1941, he inspected the Padilla oyster beds and there examined 25 or 30 kinds of these little animals which he said are more delicate in their reaction to deleterious chemical changes than oysters are, and found among plaintiff's oyster beds no change in kinds or condition of such small sea life from what he had seen in Padilla Bay some years before when he first visited the Bay before any Japanese oysters were planted there. From the condition of this more sensitive sea life Dr. Kincaid saw no approaching disaster for the oysters.

It unquestionably appears from the testimony that, in the waters suspected by plaintiff to be affected by defendant's pulp liquor and fiber, the oysters on beds other than plaintiff's, such as the small beds on Fidalgo Bay and March Point (nearer to defendant's Anacortes mill than plaintiff's beds), the Huntoon and the extensive Rock Point beds in Samish Bay (where occurred the first commercial development of Japanese oysters in this state in 1927 or 1928), and the small beds north of Point Francis in Bellingham Bay much nearer to defendant's Bellingham mill than plaintiff's beds, have been and are in good merchantable condition unaffected by pulp liquor or pulp fiber, and that the Rock Point oysters from Samish Bay have customarily enjoyed a market.

Not all of the evidence nor all of the specific points and arguments advanced in the exhaustive briefs of counsel for the respective parties have been discussed here as that would apparently extend this decision unnecessarily without corresponding benefit. Although all of the evidence has not here been discussed, it has all been considered, and that which has been mentioned is deemed of outstanding importance among the great mass of testimony introduced; and the court has endeavored to carefully study and weigh all the evidence in the light of and as it bears upon the various contentions of counsel on each side and to finally arrive at the conclusion required by the preponderance of the evidence, with the following results.

1. It must be concluded from the testimony of the oystermen and others and from what the trial judge observed on the beds that plaintiff's oysters, usually planted 40 to 60 boxes of seed per acre (and more on some beds), were except some south end beds generally planted too thick, and that throughout the beds generally are oysters in the original seed clusters not broken up as they should have been, as well as other oysters drifted together on level surfaces and collected in pot holes by wind and wave action and not scattered in accordance with good cultivation, with the result that through crowding and consequent lack of food supply the oysters have not been able to develop and fatten into marketable condition. That conclusion is strongly indicated by testimony that in more recent years, notably since about 1938 or 1939, in localities other than Padilla Bay, the growers have been reducing their seed plantings to approximately 20 to 25 boxes per acre, with definitely better results. There are, however, some good oysters on plaintiff's beds, notably on the periphery of the beds and also where they have become scattered, as well as on some south end beds not too thickly planted.

2. It is preponderantly established by the greater weight of the evidence that the water from Bellingham Bay does not normally go into Padilla Bay, but that the water goes out of and into Bellingham Bay through the passages to and from Rosario Straits and the Straits of Georgia without passing through Padilla Bay. Likewise it is established that the waters of Fidalgo Bay and Anacortes Harbor do not normally go into Padilla Bay, but that those waters go out of and into Fidalgo Bay and Anacortes Harbor through Guemes Channel and the northward tidal currents around Guemes Island, with some water from the inward tidal passage through Guemes Channel going between Hat and Guemes islands into the north end of Padilla Bay; that the south end of Padilla Bay is filled principally through Swinomish Slough which flows northward more of the time than it does southward; and that it is only on exceptional occasions of severe wind that drift wood and logs are driven across the normal tidal currents into Padilla Bay from Bellingham Bay and Anacortes Harbor. From this situation and the testimony of absence of pulp liquor in Padilla Bay, and in the absence of more convincing proof to the contrary, it is concluded that

926

the waste sulphite pulp liquor and fiber from defendant's Bellingham and Anacortes mills do not reach the waters over plaintiff's oyster beds in Padilla Bay in quantities sufficient to injure plaintiff's oysters, although insignificant amounts of such liquor and fiber may conceivably on exceptional occasions of severe wind be driven across normal currents into Padilla Bay, as drift wood and logs are on such exceptional occasions so driven.

3. After careful consideration of all the testimony and exhibits in the case, the credibility of the many witnesses and the weight of the testimony of each, all that the trial judge saw upon the view by him of the things and conditions connected with the trial, and the briefs and arguments of counsel, the court is of the opinion, and finds and decides, that plaintiff has failed to sustain its burden of proof, and that there is a failure of necessary proof on plaintiff's part in that plaintiff has not by a preponderance of the evidence established either (1) that plaintiff's oysters have been or will be injured by defendant's pulp liquor or fiber, or (2) that there has been or will be present in the water over plaintiff's oyster beds sufficient quantities of such liquor or fiber to injure plaintiff's oysters. Plaintiff, therefore, is not entitled to recover any relief against defendant.

The foregoing sufficiently disposes of the matter and renders unnecessary further rulings upon defendant's separate affirmative defenses.

Formal findings, conclusions and decree may be settled upon notice or stipulation.